**UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
COURT FILE NO.: CV – 04-1351 ADM/RLE**

| | |
|---|---|
| Bruce Beckstrom,<br><br>         Plaintiff,<br><br>v.<br><br>Direct Merchant's Credit Card Bank; Messerli & Kramer, P.A.;   CSC Credit Services, Inc.; and Trans Union LLC,<br><br>         Defendants. | **PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS CSC'S AND TRANS UNION'S MOTIONS FOR SUMMARY JUDGMENT** |

## INTRODUCTION

Plaintiff submits this Memorandum in opposition to the Motions for Summary Judgment of Defendants CSC and Trans Union ("the Defendant Consumer Reporting Agencies (CRAs)).[1]  A reasonable jury could conclude from the evidence that Trans Union violated 15 U.S.C. § 1681i in multiple ways, that CSC violated both § 1681i and 15 U.S.C. § 1681e(b), and that Defendants' violations were willful or caused Plaintiff damages or both.  Accordingly, Defendants' motions for summary judgment should be denied with respect to those FCRA claims.

---

[1] Plaintiff opposes Defendant Messerli & Kramer's Motion for Summary Judgment in a separate memorandum, filed contemporaneously herewith.

## FACTS

### I.    GENERAL BACKGROUND

Direct Merchant's Credit Card Bank ("DMCCB") account number XXXX XXXX 1003 6269 has never belonged to Plaintiff Bruce Beckstrom.  Sometime prior to May 2003, Plaintiff's son, *Bryce* Beckstrom, opened DMCCB account number XXXX XXXX 1003 6269.  (See Goolsby Aff. ¶ 2, Ex. A – Bryce Beckstrom depo. 14:9-14:12.)  Not surprisingly, Plaintiff Bruce Beckstrom and his son have at times lived at the same address.  (See Goolsby Aff. ¶ 3, Ex. B – Bruce Beckstrom depo. 17:2-17:10.)  However, father and son of course have different dates of birth.  Bryce used his own social security number, XXX-XX-6304, to open the account.  (See Bryce Beckstrom depo. 16:5-16:10.)[2] DMCCB never thought the account was opened fraudulently.  (Goolsby Aff. ¶ 4, Ex. C – Benefield depo. 60:17-61:1, 61:23-62:4.)

Defendant DMCCB never reported the account to the Consumer Reporting Agencies ("CRAs"), including Defendants CSC and Trans Union, under the name *Bruce* Beckstrom:  DMCCB's monthly reporting to the credit bureaus was always under the correct name, *Bryce* Beckstrom.  (See Benefield depo. 72:18-73:20, 119:14-120:2, 125:9-17, 178:10-178:11, Ex. 3 at DMCCB-Beckstrom 0078.)  DMCCB's monthly reporting also included *Bryce* Beckstrom's correct date of birth, September 15, 1980.  (Benefield depo. 119:10-119:11, 187:14-187:18; see also Bryce Beckstrom depo. 6:20-6:21.)

---

[2] While this fact is disputed, for present purposes it must be taken as true.  At any rate, this fact is not dispositive.

In May 2003, DMCCB, through its attorneys, Defendant Messerli and Kramer, P.A. ("Messerli"), obtained a judgment in St. Louis County Minnesota in the amount of $12,987.43 against *Bryce* Beckstrom for defaulting on account number XXXX XXXX 1003 6269.  At all times, the name on the judgment was, accurately, *Bryce* Beckstrom – not *Bruce* Beckstrom.  (See Goolsby Aff. ¶ 5, Ex. D – Fogleman depo. I 65:25-67:22, Ex. 5 at CSC-Beckstrom 0022.)

Nevertheless, the CRAs began to include the DMCCB account or the corresponding St. Louis County judgment, or both, in Plaintiff *Bruce* Beckstrom's credit file, which contained *Bruce* Beckstrom's date of birth, October 7, 1953.  (See, e.g., Fogleman depo. I Ex. 10 at CSC-Beckstrom 0093 (first page of Bruce Beckstrom's June 2003 CSC credit file, showing "Born 10/07/1953," and including Direct Merchants account number "[XXXX XXXX] 1003"); Id. at CSC-Beckstrom 0098 (last page of same credit file, showing judgment against "Bryce Beckstrom").)

Plaintiff discovered that he had been confused with his son when, in June 2003, he attempted to withdraw money from an ATM, only to discover that his bank account had been drained to satisfy the judgment against his son; Plaintiff had previously been unaware of his son's DMCCB account or of any judgment against him.  (Bruce Beckstrom depo. 19:9-19:24.)

## II.   PLAINTIFF'S DISPUTES TO THE CRAS

Plaintiff sent Trans Union, CSC's affiliate Equifax, and non-party Experian dispute letters, identical but for the respective addressees, dated December 9, 2003.  (See Reger Aff. Ex. A; Fogleman depo. I Ex. 2; Goolsby Aff. ¶ 7, Ex. F – Hughes depo. Ex.

2.)  Plaintiff provided his full name, address, date of birth ("10-7-53"), social security number ("[XXX-XX]-3609"), and two telephone numbers.  (Id.)  Plaintiff specifically identified, with the last four digits redacted, the account number for the DMCCB account in question, i.e., "Account No.:  [XXXX XXXX] 1003."[3]  (Id.)  Plaintiff requested that the judgment and "all its information" be removed from his credit file.  (Id.)  The letter constituted a dispute not only of the judgment, but also of the account.  (See Fogelman [sic][4] Decl. ¶ 18 ("Plaintiff disputed that the Direct Merchant's Credit Card Bank ("DMCCB") account  . . . belonged to him."); Fogleman depo. I 28:4-28:8; Bruce Beckstrom depo. 37:14-37:19 (explaining that the words "all its information" in the dispute letter referred to "the trade line, the judgment, anything tied – with this account").)

Most importantly, Plaintiff expressly explained that he had been confused with his son, Bryce Allan Beckstrom.  (See Reger Aff. Ex. A; Fogleman depo. I Ex. 2; Hughes depo. Ex. 2.)  By indicating that the ECOA code was "I," Plaintiff put Trans Union and

---

[3] Reger disingenuously suggests that Trans Union did not have a DMCCB account in Plaintiff's file that matched the account number Plaintiff provided in his dispute letter. (See Reger Aff. ¶ 31.)  However, the twelve digits Plaintiff provided exactly matched the first twelve digits of the only DMCCB account Trans Union had in Plaintiff's file.  The only difference was that Plaintiff left off the last four digits.  It therefore was obvious or should have been obvious to Trans Union to which account Plaintiff was referring. Indeed, it was commonplace for the account to appear on credit reports with the last four digits redacted.  (See, e.g., Compl. Exs. 4, 5.)  Trans Union cannot claim that it could not find the account:  Trans Union initiated what it deemed a "reinvestigation" of the account in question.

[4] According to her deposition testimony, Fogleman's name is spelled F-o-g-*l-e*-m-a-n. (Fogleman depo. I 6:21-22.)

CSC on notice that the account was an individual account.  (See Id.)  This necessarily meant that the account could not have belonged to both Bryce and Bruce Beckstrom.

## A. **Defendant Trans Union**

### 1. **Trans Union's front-end handling of the dispute**

When Trans Union received Plaintiff's dispute, Trans Union recognized that "the judgment related to a Direct Merchants Credit Card Bank account."  (Goolsby Aff. ¶ 6. Ex. E – Reger depo. 17:24-17:25.)[5]  Trans Union processed it as a dispute related to the credit card account trade line.  (Reger depo. 18:16-18:20.)   Trans Union knew that it "might be the belief" of Bruce Beckstrom that the account belonged to Bryce Beckstrom. (Reger depo. 22:24-23:2.)  Trans Union was not reporting the judgment.

Trans Union sent an electronic Automated Consumer Dispute Verification (ACDV) to DMCCB regarding account number XXXX XXXX 1003 6269.  Trans Union used a two-keystroke dispute code that generated a message to DMCCB that indicated it was a category "2" dispute and simply said, "Belongs to another individual with same/similar name.   Provide complete ID."  (Reger depo. 16:7-16:14; Benefield depo. Ex. 5 first and second pages.)[6]  There was a field on the ACDV in which Trans Union

---

[5] Curiously, Reger later testified, "[W]e don't know that the judgment and the account are related."  (Reger depo. 24:14-24:15.)

[6] Benefield depo. Ex. 5 and Reger Aff. Ex. B are two versions of the same ACDV:  the former is a version produced by DMCCB; the latter by Trans Union.  (Note identical control numbers.) While Reger Aff. Ex. B suggests that the parenthetical "(incld. SSN, DOB, Generation code, etc.)" appeared in the dispute code after "Provide complete ID," Benefield depo. Ex. 5 reveals that the parenthetical did not appear on the version of the ACDV that DMCCB received.

could have included the additional information that Bruce Beckstrom had provided about his son and about the judgment.  (Reger depo. 24:19-24:24.)

Nevertheless, Trans Union failed to complete that field or otherwise include the highly relevant information it had received from Plaintiff that he had been confused with his son, Bryce Beckstrom, or that there was a judgment relating to the same account against Bryce.  (See Benefield depo. Ex. 5 first page (showing the "FCRA relevant information field" left blank by Trans Union).)   Such information would have been helpful to DMCCB in conducting its investigation.  (See Benefield depo. 44:6-45:3.)

### 2.  Trans Union's back-end handling of the dispute

In its ACDV response back to Trans Union, DMCCB put a "D" in the first name field to indicate that the first name it had for the account was different from the first name Trans Union had, "Bruce."  (Reger depo. 30:3-30:13.)[7]  DMCCB specifically told Trans Union that the first name DMCCB had for the account was *Bryce*."  (Reger depo. 31:8-31:12, Benefield depo. Ex. 5 first page.)[8]

---

[7] DMCCB used a response code to indicate, "account information accurate as of date reported."  (Reger depo. 35:18-35:25.)  However, Trans Union knows that in the parlance of the industry, "account information," such as the credit limit and the balance owing, is distinguished from "indicative information," such as name, address, date of birth, and social security number.  (Reger depo. 36:7-36:19.)  DMCCB's response code therefore was not verifying the name or other indicative information as accurate.

[8] Reger claims – without citation to any evidence – that DMCCB "returned the last name 'Bruce' " to Trans Union.  (Reger Aff. ¶ 51.)  There is no evidence that DMCCB returned "Bruce" as any part of the account holder's name.  Instead, the evidence shows that DMCCB correctly returned the first name "Bryce" and the last name "Beckstrom." (Benefield depo. Ex. 5, first page.)

Nevertheless, Trans Union's interpretation of the response from DMCCB was that the names matched.  (Reger depo. 38:17-38:18.)[9]  Trans Union assumed that DMCCB's indication that the owner of the account was "*Bryce*" not "*Bruce*" "could very easily be a typographical error."  (Reger depo. 31:22-32:2.)  This was despite the fact that Trans Union, of course, had the information that the "u" and the "y" were all that differed between Plaintiff's name and the name of the person with whom he claimed to have been confused.  (Reger depo. 33:23-34:10.)

Trans Union incorrectly claims that by checking the "Verified as Reported" box, DMCCB supposedly instructed Trans Union that "*all information* about the disputed tradeline was, in fact, accurate and no changes should be made."  (Trans Union's Mem. at 12 (emphasis added).)  Actually, on an ACDV, which is an industry standard system, "Verified as Reported" does not pertain to the indicative or identifying information in the top section of an ACDV; instead, it pertains only to the trade line and trade history information below.  (Fogleman depo. I 60:4-60:12.)

Trans Union did not receive back from DMCCB everything Trans Union had asked for.  (Reger depo.  55:20-55:23, 63:17-63:18.)  Specifically, DMCCB did not verify that Plaintiff's date of birth was the correct date of birth for the owner of the account in question.  (Reger depo. 64:10-64:14.)  Trans Union considers the date of birth to be a critical component of the information necessary to distinguish one person from

---

[9] Reger has misrepresented, under penalty of perjury, that "the names matched."  (Reger Aff. ¶ 56.)  The Court may take judicial notice that, as a matter of law, "Bryce" and "Bruce" do *not* match.  Even the other defendants in this case admit as much.  (<u>See</u>

another.  (See Reger depo. 54:12-54:16.)  Reger admits that "in order to make a sound and credible decision regarding the investigation," Trans Union needs a furnisher such as DMCCB to "provide all information available."  (Reger Aff. ¶ 47.)  DMCCB did not. Indeed, Trans Union's record of the "reinvestigation" states, "Ownership Verification Of: *None verified.*"  (Reger depo. Ex. 2 at TU0003 (emphasis added).)

Nevertheless, Trans Union sent investigation results to Plaintiff indicating that DMCCB account number XXXX XXXX 1003 6269 was "VERIFIED, NO CHANGE." (Reger Aff. ¶ 59, Ex. C at 1.)  Trans Union continued to maintain the DMCCB account in Plaintiff's file.  (See Reger Aff. ¶ 60, Ex. C at 2.)

Trans Union had placed a so-called "do not merge" indicator on Plaintiff's file, but that did not stop Trans Union from continuing to merge Bryce Beckstrom's information into his father's file:  the do-not-merge feature for some reason does not have any affect on investigations Trans Union initiates or on the results of those investigations.  (Reger depo. 43:18-43:22.)[10]

Trans Union admits that the decision to deem the account verified as belonging to Bruce Beckstrom was a decision that Trans Union – not DMCCB – made.  (Reger depo. 39:3-39:24; see also Benefield depo. 118:2-118:19.)  Even under rigorous cross-

---

Goolsby Aff. ¶ 10, Ex. I – Kruger depo. 34:14-34:18, 39:8-39:11; Fogleman depo II 11:20-22.)  Reger might as well have claimed that a mouse is the same as a moose.

[10] Defendants Trans Union and CSC point out that they give a consumer a chance to insert into the credit file a statement regarding the disputed information.  (See Reger Aff. ¶ 11; Fogelman Decl. ¶¶ 15, 22.)  While that fact is irrelevant to the present lawsuit, there is no evidence, at any rate, that such a consumer statement would do any more good than Trans Union's other superficial consumer-appeasement feature, the so-called "do not merge" indicator.

examination by Trans Union's counsel, DMCCB's representative plainly explained how Trans Union, by deeming the name the same even though DMCCB had returned a different first name, did not correctly calculate the result.   (Benefield depo. 149:4-149:16.)

Trans Union failed to remove the DMCCB account from Plaintiff's file until after Plaintiff was forced to file this lawsuit in March 2004.  (See Reger Aff. ¶¶ 61-62.)

## B. **Defendant CSC**

### 1.  **CSC's front-end handling of the dispute**

CSC's communication to DMCCB of Plaintiff's dispute was even more vague than Trans Union's:  CSC's ACDV simply communicated the dispute as code "1," which stood for "Not his/hers.  Provide complete ID."  (Benefield depo. Ex. 5 third page.)  CSC failed to even explain, "Belongs to another individual with same/similar name." (Compare Benefield depo. Ex. 5 third page with Benefield depo. Ex. 5 first page.)[11]  Like Trans Union, CSC left the "FCRA Relevant Information" field blank and failed to include the highly relevant information it had received from Plaintiff that he had been confused with his son, Bryce Beckstrom, or that there was a judgment relating to the same account against Bryce.  (See Benefield depo. Ex. 5, page 3.)  It was no mistake that CSC failed to fill-in the "FCRA Relevant Information" field:  it was CSC's policy when

---

[11] Fogleman claimed at her deposition that dispute code 1 was more appropriate than dispute code 2 because the former included the instruction "provide complete ID" and the latter supposedly did not.  (Fogleman depo. I 36:19-37:7.)  However, she was wrong regarding whether the dispute code CSC used provided more instruction to the furnisher: the ACDV from Trans Union shows that dispute code 2 *did also* include "provide

using dispute code 1 to not use the "FCRA Relevant Information" field.  (Fogleman depo. I 50:16-50:22.)

A bare "not mine" with no other information makes it "very difficult" for a furnisher such as DMCCB "to know what needs to be investigated and where the investigation needs to go."  (Benefield depo. 37:23-38:2; see also Id. at 86:25-87:2.)  Not surprisingly, DMCCB gives less importance to ensuring that there is an exact name match when a CRA uses dispute code 1, "not his/hers," as opposed to dispute code 2, "Belongs to another individual with same/similar name."   (Benefield depo. 113:5-113:17.)

The information that Bruce was the father and Bryce the son would have been useful, relevant information for DMCCB.  (Benefield depo. 98:4-98:15.)  It would have been "very helpful" to DMCCB to be provided with information to help them understand that Bruce and Bryce were two separate people with overlapping demographics. (Benefield depo. 99:15-99:18.)    In DMCCB's opinion, the fact that Plaintiff was also concerned about the appearance on his credit report of the judgment against his son was additional relevant information that the CRAs should have provided in the "FCRA Relevant Information" field.  (Benefield depo. 100:8-100:13.)  DMCCB's representative, upon seeing Plaintiff's dispute letter at his deposition, testified that the information CSC and Trans Union possessed but failed to forward to DMCCB would have made it clear to DMCCB that Bruce and Bryce were separate people.  (Benefield depo. 183:24-184:13.)

complete ID"  (see Benefield depo. Ex. 5, first page) – although, as noted, neither Trans Union nor CSC informed DMCCB that Bruce had been confused with Bryce.

CSC also initiated an investigation of the corresponding judgment that CSC had been reporting in Plaintiff's file.

### 2. CSC's back-end handling of the dispute

CSC's investigation of the judgment determined that, because information on the judgment – including the first name – did not match information CSC had for Plaintiff Bruce Beckstrom, the judgment had to be deleted from Bruce Beckstrom's file. (See Fogleman depo. I 73:3-73:8, Ex. 5 at CSC-Beckstrom 0022; Goolsby Aff. ¶ 8, Ex. G – Fogleman depo. II 13:3-13:24, Ex. 1.)

Meanwhile, Regarding CSC's investigation of the corresponding tradeline, DMCCB's response to CSC's ACDV showed, in the section for the indicative information, that DMCCB had the "same" information as CSC only for the address. (Fogelman Decl. Ex. A; Benefield depo. 182:6-182:9.) "Same" was not indicated for the name or date of birth. (See Id.)

DMCCB again did not verify that Plaintiff's date of birth was the correct date of birth for the owner of the account in question. (Fogleman depo. I 59:22-60:3.) CSC, like Trans Union, considers the date of birth to be a critical component of the information necessary to distinguish one person from another. (Fogleman depo. I 64:16-64:19.)

Nevertheless, CSC continued to maintain the tradeline for the individual DMCCB account in Plaintiff's file. CSC sent investigation results to Plaintiff indicating that DMCCB account number XXXX XXXX 1003 6269 was "VERIFIED" as belonging to Plaintiff, yet inconsistently indicating that the corresponding judgment had been deleted. (Fogleman depo. I 88:20-88:23, Ex. 3 at CSC-Beckstrom 0019.)

CSC's representative could not say whether CSC conducted any further investigation upon being sued.  (See Fogleman depo. I 130:1-130:8.)  Shortly after this lawsuit was started, DMCCB sent CSC's affiliate Equifax a Universal Data Form with the instruction to delete account number XXXX XXXX 1003 6269 for the reason: "*ACCOUNT REPORTED IN ERROR.*"  (Benefield depo. 69:3-69:24, Ex. 3 at DMCCB-Beckstrom 0001.)

Nevertheless, CSC continued to include the DMCCB account in Plaintiff's file at least through August 2004, five months after Plaintiff was forced to file this lawsuit. (See Fogleman depo. I 127:9-127:13.)  In fact, Fogleman did not know if the account had ever been removed from Plaintiff's file.   (See Fogleman depo. I 127:14-127:19.) Fogleman testified that she believed the account should still remain on Plaintiff's file. (See Fogleman depo. I 127:20-128:4.)   CSC prepared credit reports on Plaintiff, including for "HSBC Retail Services" on 04/03/04, "I4 Commerce Inc." on 04/05/04, and "Wells Fargo Bank" on 05/04/04.    (Bruce Beckstrom depo. Ex. 4 at pages 003-004 (under "Companies that Requested your Credit History").)

### C. __Non-party Experian__

When Experian received Plaintiff's dispute letter,

[b]ased on the information provided by Mr. Beckstrom in his letter indicating that there was information on his credit report that belonged to his son Bryce Allan Beckstrom, Experian reviewed their file, discovered that there was information on the file pertaining to Bryce Allan Beckstrom and proceeded to separate the information.

(Hughes depo. 8:4-8:10.)  Experian employed its "internal mix file procedures."  (Id. at 7:20-25.)  When Experian determined that the judgment and the DMCCB tradeline did

not belong to Plaintiff, Experian moved them from Bruce Beckstrom's file to Bryce Beckstrom's.  (See Id. at 9:20-11:14.)  Accordingly, Experian sent investigation results to Plaintiff indicating that both the St. Louis County judgment and the corresponding DMCCB tradeline had been deleted from his file.  (See Id. 13:7-13:22.)

Plaintiff has no complaint with Experian.

### III.    PLAINTIFF'S DAMAGES

The DMCCB account damaged Plaintiff's creditworthiness:  the CRAs knew that the DMCCB account was an adverse tradeline that was derogatory for Plaintiff.  (See Reger depo. 39:25-40:6; Fogleman depo. I 80:24-81:7.)  The DMCCB account was listed as a charge-off.  (Fogleman depo. I 81:4-81:5.)  A charge-off is reported with an "R9" status – the worst possible status.  (Fogleman depo. I 80:24-81:7.)

In addition, the ordeal of being confused with his son – including the defendant CRAs' failure to remove the inaccurate DMCCB account from Plaintiff's credit report – has caused  Plaintiff substantial emotional distress.  (See generally Bruce Beckstrom depo. 71:17-72:11, 172:2-172:7.)   This emotional distress has manifested itself in sleepless nights for Plaintiff, on average of "once or twice a week" over the last two years.  (Bruce Beckstrom depo. 71:22-71:24, 73:21-75:14.)  Plaintiff's wife testified at length that she has witnessed Plaintiff's sleepless nights and irritability caused by the inaccuracy on his credit report.  (See Goolsby Aff. ¶ 9, Ex. H – Christine Beckstrom depo. 19:5-29:9.)  Plaintiff's emotional distress has also manifested itself in "lack of concentration," and "depression."  (Bruce Beckstrom depo. 72:22-73:12.)  Plaintiff's

assistant at his job has witnessed Plaintiff's inability to concentrate at work.  (See Bruce

Beckstrom depo. 76:14-77:2.)

## **ARGUMENT**

### I.   LEGAL STANDARD

Summary judgment is granted only when "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that

there is no genuine issue as to any material fact and that the moving party is entitled to

judgment as a matter of law."   Fed. R. Civ. P. 56(c).   In deciding on a motion for

summary judgment, the evidence of the non-moving party must be believed as true, all

doubts must be construed in the light most favorable to the non-moving party, and all

reasonable inferences must be drawn in the non-moving party's favor.   See Hunt v.

Cromartie, 526 U.S. 541, 550-55 (1999).   So long as more than one reasonable inference

can be drawn, and that inference creates a genuine issue of material fact, the trier of fact

is entitled to decide which inference to believe, and summary judgment is not

appropriate.   See Id. at 552.   A genuine issue of material fact exists when the evidence

before the court is such that reasonable persons could return a verdict in favor of the non-

moving party.   See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-52 (1986).

### II.   DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT SHOULD BE DENIED BECAUSE A REASONABLE JURY COULD CONCLUDE FROM THE EVIDENCE THAT DEFENDANTS VIOLATED THE FCRA AND EITHER CAUSED PLAINTIFF DAMAGE OR ACTED "WILLFULLY" OR BOTH.

#### A. The FCRA is a consumer protection statute that is to be liberally construed in favor of the consumer.

A general overview of the FCRA and its relevant sections provides helpful background to the nature of Plaintiff's FCRA claims and why Defendants' Motions should be denied.

As the title of the Fair Credit Reporting Act suggests and as Congress explained in the Act itself:

> It is the purpose of this subchapter to require that consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information in accordance with the requirements of this subchapter.

15 U.S.C. § 1681(b); see, e.g., Philbin v. Trans Union Corp., 101 F.3d 957, 962 (3d. Cir. 1996). The FCRA was prompted by "congressional concern over abuses in the credit reporting industry." Philbin, 101 F.3d at 962; see also Guimond v. Trans Union Credit Info. Co., 45 F.3d 1329 (9th Cir. 1995). Further, it is fashioned so as to protect the credit worthiness and reputation of every consumer. Ackerly v. Credit Bureau of Sheridan, Inc., 385 F. Supp. 658 (D. Wyo. 1974). The FCRA was crafted to protect consumers from the transmission of inaccurate information about them. Kates v. Croker National Bank, 776 F.2d 1396, 1397 (9th Cir. 1985). Like the other portions of the Consumer Credit Protection Act of 1968, the FCRA is to be liberally construed in favor of the consumer. See Guimond v. Trans Union Credit Info. Co., 45 F.3d 1329, 133 (9th Cir. 1995).

Congress enacted the FCRA to protect consumers against "the trend toward ... the establishment of all sorts of computerized data banks [that place a consumer] in great

danger of having his life and character reduced to impersonal 'blips' and key punch holes

in a stolid and unthinking machine which can literally ruin his reputation without cause,

and make him unemployable." Dalton v. Capital Associated Industries. Inc., 257 F. 3d

409 (4th Cir. 2000) (citing 116 Cong. Rec. *36570)*. As a result, the FCRA imposes

*"grave responsibilities"* on credit reporting agencies to ensure the accuracy of the

information that they report. See Cushman v. Trans Union Corn., 115 F. 3d 220, 225 (3d.

Cir. 1997) (emphasis added).

**B. A reasonable jury could hardly help but conclude from the evidence that Defendants violated the FCRA.**

**1. Trans Union violated § 1681i by failing to conduct a reasonable investigation of the disputed information and failing to delete information that could not be verified.**

a.  Trans Union's duty was triggered.

Upon receiving notice from a consumer of a dispute concerning the accuracy or

completeness of an item of information on the consumer's credit report, a credit reporting

agency has specific duties under 15 U.S.C. § 1681i. Trans Union's first argument with

respect to § 1681i is that Plaintiff's dispute letter was supposedly somehow not explicit

enough to trigger Trans Union's duty to investigate the DMCCB account.

Trans Union has tried and failed with the same argument before.  In O'Connor v.

Trans Union Corp., File No. 97-4633 (E.D. Pa. 1999) (Goolsby Aff. ¶ 13, Ex. L), Trans

Union argued that it had no duty to reinvestigate because the dispute letter, without

identifying specific accounts, only stated, "none of the 'adverse' information relates to

me." Id., slip op. at 13-14.  The court disagreed.  See Id. at 14.  The court reasoned that it

was not necessary to specifically identify each item in dispute when the letter otherwise

indicated which items were disputed.  See Id.   Additionally, the court explained:

> Finally, and perhaps most telling, Plaintiff's initial letter did in fact result in
> Trans Union conducting an investigation, which culminated in Trans
> Union's reinvestigation report of March 14, 1997.  In direct contrast with
> the arguments that Defendant now sets forth in support of its instant
> motion, Trans Union had felt obliged to conduct an investigation upon
> receipt of Plaintiff's initial letter.  It seems disingenuous to the Court for
> Trans Union to now state that it never had such a duty.

Id.

Plaintiff's dispute letter in the present case was *more* explicit than the letter that

was deemed sufficient in O'Connor.   In the present case, Plaintiff's dispute letter

expressly identified the creditor ("Direct Merchants Credit Card Bank"), provided the

first twelve digits of the account number, expressly used the word "Account," stated that

Plaintiff was disputing not just the judgment but also "all its information," and carefully

explained that the judgment relating to the same *individual* account was against

Plaintiff's son, Bryce Beckstrom.

Furthermore, Trans Union did in fact conduct a "reinvestigation" of the DMCCB

account, so it is disingenuous, as in O'Connor, for Trans Union to now assert that it had

no such duty.  Hence, no reasonable jury could find that Plaintiff was not disputing the

account as well as the judgment.  Accordingly, the Court should find as a matter of law

that Trans Union's duty to investigate was triggered.

In the alternative, even if a reasonable jury could somehow conclude that Plaintiff

was not disputing the account as well as the judgment, it would not, of course, entitle

Trans Union to summary judgment.  Trans Union would only be entitled to summary

judgment if reasonable minds could only conclude that Plaintiff was *not* disputing the account.

This Court has recognized that in the case of a less-than-perfectly-clear FCRA dispute letter,[12] the essence of the dispute may present a jury question:

> According to CSC, removing the tradeline all together complied with Wharram's request.  According to Wharram, however, this letter was never intended to result in the removal of the entire tradeline, just the errors within that tradeline.  What Wharram intended by the letter is a question of fact that must be resolved by a trier of fact.  . . . CSC argues that it is entitled to judgment as a matter of law because it complied with 15 U.S.C. § 1681i(a)(5).  . . . This argument is not persuasive because Wharram's request for the investigation could reasonably be interpreted two ways.

Wharram v. Equifax, et al., File No. 02-4853, slip op. at 5-6 (D. Minn. 2004) (Goolsby Aff. ¶ 14, Ex. M.)

In the present case, various consumer reporting agency employees have already concluded that Plaintiff's letter constituted a dispute of the account as well as the judgment.[13]  (See Fogelman Decl. ¶ 18; Hughes depo. 8:4-8:10.)  Accordingly, Trans Union is not entitled to summary judgment because – at a minimum – whether Plaintiff disputed the account, as opposed to just the judgment, presents a jury question.

b.   Trans Union failed to perform a reasonable reinvestigation.

Under § 1681i, upon receiving a dispute with respect to an item, a CRA must perform a "reinvestigation" of that item.  The term "reinvestigation" is not defined by the FCRA.  See 15 U.S.C. § l68la (providing definitions but none for "reinvestigation").

---

[12] Plaintiff does not concede that the dispute letter here was less than perfectly clear.

[13] CSC, which received an identical dispute letter, makes no claim that the dispute went only to the judgment and not to the corresponding account.

In applying federal statutory language, courts should follow the ordinary usage of terms, unless Congress gives them a specified or technical meaning. See, e.g.,. <u>Will v. Michigan Den't of State Police</u>, 491 U.S. 58, 64 (1989).  Although the FCRA does not define "investigation," a recent Circuit court opinion on the sorts of "investigations" required under the FCRA noted that according to dictionaries,

> "investigation," is defined as "[a] detailed inquiry or systematic examination." *Am. Heritage Dictionary* 920 (4th ed. 2000); *see Webster's Third New Int'l Dictionary* 1189 (1981) (defining "investigation" as "a searching inquiry"). Thus, the plain meaning of 'investigation' clearly requires some degree of careful inquiry.

<u>Johnson v MBNA</u>, 357 F.3d 426, 430 (4th  Cir. 2004) (construing the term it is used in the FCRA). Black's dictionary defines the word "investigation" as "to follow up step by step by patient inquiry and observation.  To trace and track; to search into; to examine and inquire into with care and accuracy; to find out by careful inquisition; examination; the taking of evidence . . . ."   Black's Law Dictionary 712 (5th ed. 1979).  Courts have consistently held that a CRA's reinvestigation must be reasonable.  <u>See, e.g.,</u> <u>Cahlin v. Gen. Motors Acceptance Corp.</u>, 936 F.2d 1151, 1160 (11th Cir. 1991); <u>Pinner v. Schmidt</u>, 805 F.2d 1258, 1262 (5th Cir. 1986).

While the FCRA does not define "reinvestigation," it does specify certain procedures that must be included in a CRA's reinvestigation.  Such reinvestigation must include, inter alia, prompt notice of the dispute to the furnisher of the information:  "The notice shall include all relevant information regarding the dispute that the agency has received from the consumer." § 1681i(a)(2).  The CRA must also review and consider all relevant information submitted by the consumer, § 1681i(a)(4).

The onus is on the CRA to provide the furnisher with sufficient detail of the dispute to enable the furnisher, for its part, to conduct its own reasonable investigation. As one Circuit Court recently explained:

> [The furnisher's] investigation in this case was reasonable given the scant information it received regarding the nature of [the consumer's] dispute. [The furnisher] received a CDV from Trans Union indicating that [the consumer] was disputing the charge on the basis that the account did not belong to him. The CDV did not provide any information about possible fraud or identity theft or include any of the documentation provided to Trans Union. . . . Had Trans Union given [the furnisher] notice that the nature of the dispute concerned fraud, then perhaps a more thorough investigation would have been warranted.

Westra v. Credit Control of Pinellas, No. 01-3139 (7th Cir. May 27, 2005) (Goolsby Aff. ¶ 15, Ex. N ) This Court has likewise held:

> The CDV form Trans Union sent does not identify the basis of Plaintiff's dispute. . . . The CDV form does not specify that Plaintiff believed the account belonged to his ex-wife only, or that she forged his signature to open it. Consequently, . . . [the furnisher] was not given a complete explanation of Plaintiff's concerns. . . . [S]pecific notice of Plaintiff's concerns could have compelled [the furnisher] to conduct a more thorough review.

Malm v. Household Bank, et al., Civ. No. 03-4340 (D. Minn. 2004) (ADM/AJB) (Goolsby Aff. ¶ 16, Ex. O).

In this case, Trans Union failed to conduct a reasonable reinvestigation by failing to "include all relevant information regarding the dispute that the agency has received from the consumer." § 1681i(a)(2)(A). In accordance with Trans Union's standard operating procedure, Trans Union never forwarded to DMCCB Plaintiff's dispute letter. Trans Union failed to utilize the "FCRA Relevant Information" field and otherwise failed to convey that Plaintiff had explained that he had been confused with his son, Bryce. As

DMCCB testified, this information would have been relevant and helpful. Had DMCCB known that the person Plaintiff claimed to have been confused with was his son – who necessarily had a different date of birth – DMCCB might have recognized the critical importance of providing the account holder's date of birth in the ACDV response.[14]

Trans Union also failed to conduct a reasonable reinvestigation by failing to review and consider all relevant information submitted by the consumer, as it related to the information that Trans Union had been receiving from DMCCB on a monthly basis. See § 1681i(a)(4). Had Trans Union compared Plaintiff's dispute with DMCCB's monthly reporting, Trans Union would have seen that indeed, the DMCCB account was being reported with different indicative information than Trans Union had for Bruce Beckstrom. That is exactly what Experian did. Experian was thus able to accurately resolve Plaintiff's dispute without even having to consult DMCCB.

   c.   Trans Union failed to appropriately delete the unverified account upon receiving DMCCB's response.

A central part of the FCRA's reinvestigation requirements, of course, is that after a reinvestigation, a CRA must delete or modify as appropriate any disputed item of information that is "inaccurate or incomplete or cannot be verified." § 1681i(a)(5)(A).

The term "verified" is again not defined in the FCRA. See 15 U.S.C. § 1681a. Black's Law Dictionary defines "verify" as "1. To confirm or substantiate by oath or affidavit. . . . The word "verified," when used in a statute, ordinarily imports a verity

---

[14] DMCCB, who is also a defendant in this case, has not moved for summary judgment. It is worth noting here, however, that by failing to provide the account holder's date of birth, DMCCB failed in its statutory duty under 15 U.S.C. § 1681s-2(b).

attested by the sanctity of an oath.  It is frequently used interchangeably with "sworn." To prove to be true; to confirm or establish the truth or truthfulness of . . . ."  Black's Law Dictionary 1400 (5th ed.  1979).

In this case, DMCCB confirmed that the truth was exactly as Plaintiff had said: that the owner of the account was Bryce, not Bruce.  DMCCB's response with respect to the name of the account holder could not have been more clear.  Trans Union's attempt to explain why it did not delete the account when DMCCB confirmed that the account holder was Bryce, not Bruce, is an exercise in sophistry.

Disputed information that cannot be verified must be deleted.  <u>See</u> § 1681i(a)(5)(A).  Hence, Trans Union is not saved by the fact that DMCCB failed to provide the account holder's date of birth.  Trans Union insists they cannot make "a sound and credible decision regarding the investigation" without all the information from the furnisher.  Because the absence of the date of birth precluded Trans Union from making "a sound and credible decision," the attribution of the account to Bruce Beckstrom was not verified.  Accordingly, Trans Union was statutorily obligated to delete the account.

Hence, there is ample evidence from which a reasonable jury could conclude that Trans Union failed to uphold its 1681i reinvestigation and results-processing duties.

**2.  CSC violated § 1681i and § 1681e(b).**

a.  <u>CSC violated § 1681i by failing to conduct a reasonable investigation of the disputed information and failing to delete information that could not be verified.</u>

The analysis under § 1681i is somewhat different for CSC because, while DMCCB did verify the first name as "Bruce" in its ACDV response to CSC, CSC had provided an even scanter description of the dispute to DMCCB in the first place. Thus, while Trans Union's conduct was most egregious on the back-end, CSC's conduct was most egregious on the front end. Neither, however, performed its statutory duty on either end.

Courts have noted that "a 'reinvestigation' that merely shifts the burden back to the consumer and the credit grantor cannot fulfill the obligations contemplated by the statute. . . . *Whatever considerations exist, it is for 'the trier of fact [to] weigh these factors in deciding whether [the defendant] violated the provisions of section 1681i.' "* Cushman, 115 F. 3d at 225, 227 (citation omitted) (emphasis added). In so opining, the Third Circuit followed the rulings of other Circuit Courts from around the country which have also found that a credit reporting agency's mere parroting or mimicking process criticized in Cushman falls far short of the type of "investigation" required by section 1681i of the FCRA, and creates a factual issue precluding summary judgment. See Henson v. CSC Credit Servs., 29 F.3d 280, 286 (7th Cir. 1994) (failure to inquire as to plaintiff's disputes about state court judgment docket a violation of 1681i); Stevenson v. TRW Inc., 987 F.2d 288, 293 (5th Cir. 1993) (only sending CDV forms to plaintiff's creditors and not calling them constituted a violation of the FCRA); Bryant v. TRW, Inc., 689 F.2d 72, 79 (6th Cir. 1982) (merely making two calls to plaintiff's creditors insufficient investigation); see also Curtis v. Trans Union, Nos. 02-C-207, 02-C-208, 2002 WL 31748838 * 5 (N.D. Ill. Dec. 9, 2002) (Goolsby Aff. ¶ 17, Ex. P) (rejecting

argument that merely reporting what credit furnisher provides is sufficient in context of investigation); Richardson v. Fleet Bank of Mass., 190 F. Supp. 2d 81, 88 (D. Mass. 2001) (noting that mere parroting is insufficient and that reasonableness of 1681i investigation usually is question for jury).

This District has shown a reluctance to grant summary judgment for CRA defendants on claims under 15 U.S.C. § 1681i where there is question of fact as to the reasonableness of an investigation. See, e.g., Olwell v. Medical Information Bureau, Civ. No. 01-1481, slip op. at 11-12 (D. Minn. 2003) (JRT/FLN) (Goolsby Aff. ¶ 21, Ex. T).

Likewise, the FTC has commented, "Depending on the nature of the dispute, reinvestigation and verification may require more than asking the original source of the disputed information the same question and receiving the same answer."  16 CFR 600, Appendix – FTC Official Staff Commentary on the Fair Credit Reporting Act, § 611.

In this case, a reasonable jury could find that it was unreasonable for CSC to use the non-informative "not his" code, as opposed to the slightly more informative "same or similar name" – or ideally, the free-text "FCRA relevant information" field.  Likewise, a reasonable jury could find that it was unreasonable for CSC to simply parrot the furnisher when the furnisher did not even verify all the indicative information, including the critical date of birth.  A jury could find it particularly unreasonable to merely parrot the furnisher when the investigation instruction to the furnisher had been so meager.  CSC therefore cannot place the blame entirely on the furnisher for failing to delete the inaccurate information.

     b. <u>CSC violated § 1681e(b) by failing to follow reasonable procedures to ensure the maximum possible accuracy of Plaintiff's credit file after concluding the investigation.</u>

In addition to the mandates that CRAs conduct reasonable investigations of consumer disputes and delete unverifiable information, the FCRA provides, "*Whenever* a consumer reporting agency prepares a consumer report, it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 1681e(b) (emphasis added).

"The reasonableness of the procedures and whether the agency followed them will be jury questions in the overwhelming majority of cases." <u>Guimond v. Trans Union</u>, 45 F.3d 1329, 1333 (9th Cir. 1995). Likewise, the Eleventh Circuit held that the reasonableness of procedures will be a "jury question in the overwhelming majority of cases." <u>Cahlin v. General Motors Acceptance Corp.</u>, 936 F.2d 1151, 1156 (11th Cir. 1991); <u>see also, e.g.</u>, <u>Graham v. CSC Credit Services, et al</u>, Civ. No. 02-CV-3707, slip op. at 7-8 (D. Minn. 2004) (MJD/JGL) (Goolsby Aff. ¶ 22, Ex. U).

The Third Circuit held that once a plaintiff has "demonstrated inaccuracies in his credit report, a defendant can only prevail on summary judgment if it can produce evidence that demonstrates as a matter of law that the procedures it followed were reasonable." <u>Philbin</u>, 101 F. 3d at 965. The fact that a defendant misreported and then reverified false information is evidence of unreasonable procedures. The Third Circuit looked to <u>Guimond</u>, and <u>Cahlin</u> and arrived at the conclusion that the mere fact the defendant TRW had issued two credit reports with inaccurate information was "sufficient to permit a jury to infer that TRW did not follow reasonable procedures" in violation of

section 1681e(b).   Philbin, 101 F. 3d at 966; see also Boris v. Choicepoint Servs., Inc., 249 F. Supp. 2d 851 (W.D. Ky. 2003) (noting that even section 1681(e)(b) claims under FCRA typically are questions for jury).

Courts have widely held that once a Plaintiff has made a showing that the CRA prepared a report containing inaccurate information, the burden shifts to the CRA to show that its procedures were reasonable.  Stewart v. Credit Bureau, Inc., 734 F.2d 47 (D.C. Cir. 1984); Guimond v. Trans Union Credit Information Co., 42 F.3d 1329, 1333 (9th Cir. 1995).   Under any standard, the Plaintiff's burden is met when the Plaintiff has shown that the CRA prepared reports with the false information after having earlier corrected the false information.  Philbin v. Trans Union Corp., 101 F.3d 957, 960-62 (3d Cir. 1996).

Even courts that have held that a CRA's duty of reasonableness is not triggered unless it is on notice of a problem have held that after such notice, the CRA's reasonableness is usually a jury question.  Crabill v. Trans Union, 259 F.3d 662, 664 (7th Cir. 2001).

The Seventh Circuit explained:

Although Trans Union was entitled to program its computer to select any file whose identifiers closely matched those contained in the creditor's request for information, once it learned from Jerry that the two files indeed referred to different people the statutory duty [under § 1681e(b)] clicked in, and at that point the continued sending of both files to creditors might be viewed as a failure to maintain reasonable procedures for assuring accuracy. The determination of the "reasonableness" of the defendant's procedures, like other questions concerning the application of a legal standard to given facts (notably negligence, a failure to exercise reasonable care), is treated as a factual question even when the underlying facts are undisputed. It therefore cannot be resolved on summary judgment unless

the reasonableness or unreasonableness of the procedures is beyond question.

Id. (citations omitted).

The Seventh Circuit has indicated what would be enough to put a CRA on notice of a problem.  The Seventh Circuit's recent decision in Sarver v. Experian Information Solutions, 390 F.3d 969 (7th Cir. 2004), extended the Seventh Circuit's prior holding in Hensen v. CSC Credit Servs., 29 F.3d 280 (7th Cir. 1994), and held that a consumer reporting agency is not liable, as a matter of law, for reporting inaccurate information "*unless there was prior notice from the consumer that the information might be inaccurate.*"  Sarver, 390 F.3d at 972 (citing Hensen, 29 F.3d at 285) (emphasis added).

A CRA's obligation under § 1681e(b) is not extinguished upon receiving notice of a dispute, but instead, by the express language of the statute, attaches "*Whenever* a consumer reporting agency prepares a consumer report." § 1681e(b) (emphasis added). Thus, a CRA must follow reasonable procedures to assure maximum possible accuracy both before and after receiving notice of a dispute.

CSC prepared consumer reports on Plaintiff after it was put on notice that the DMCCB account was inaccurate, but failed to remove it.  Indeed, CSC failed to remove the account and prepared consumer reports on Plaintiff even after DMCCB sent the Universal Data Form expressly instructing that the account should be deleted from Bruce's file.

CSC engages in mere wishful thinking when it argues that there is no evidence of more reasonable procedures than the ones CSC used.  (See CSC's Mem. at 18.)  The

mixed-file procedures that Experian followed, of course, are the more reasonable procedures that CSC (and Trans Union) should have used.   That is, the reasonable procedure upon receiving notice from Plaintiff of the error would have been to look at DMCCB's monthly reporting, recognize that Plaintiff's protestation was consistent with it, and transfer both the account and the judgment from Bruce's file to Bryce's file accordingly.   Experian did precisely that, and has never been named in this lawsuit.

Furthermore, even Trans Union followed a more reasonable procedure than CSC when DMCCB sent the Universal Data Form in April 2004 indicating that the account should be deleted from Bruce's file.   Trans Union's procedure, at least, was to delete the account at that time – but CSC continued to maintain the account in Plaintiff's file at least for another four months.

    **C.**   **<u>Plaintiff's claims are not defeated on the basis of any supposed deficiency in damages.</u>**

    **1.**   **Defendant CRAs caused Plaintiff to suffer actual damages.**

A Plaintiff is obviously entitled to monetary damages for credit denials and less favorable credit terms caused by inaccuracies on the plaintiff's credit report in violation of the FCRA.   However, it is also well established that to show actual damages under the FCRA, it is not necessary to show a denial of credit.   <u>Bakker v. McKinnon</u>, 152 F.3d 1007, 1013 (8th Cir. 1998) (emotional distress damages available for FCRA violations); <u>Cousin v. Trans Union Corp.</u>, 246 F.3d 359, 369 n.15 (5th Cir. 2001) (humiliation and mental distress damages available under FCRA even absent out-of-pocket losses); <u>Casella v. Equifax Credit Information Services</u>, 56 F.3d 469, 474 (2d Cir. 1995) (same).

Damages have been awarded in FCRA cases for loss of sleep, nervousness, frustration, and mental anguish; see, e.g., Millstone v. O'Hanlon Reports, Inc., 383 F. Supp. 269, 276 (E.D. Mo. 1974); Rasor v. Retail Credit Co., 554 P.2d 1041, 1048-50 (Wash. 1976); injury to reputation, family, work and sense of well-being; see, e.g., Morris v. Credit Bureau of Cincinnati, 563 F. Supp. 962, 969 (S.D. Ohio 1983); and humiliation, embarrassment, and mental distress; see, e.g., Fischl v. GMAC, 708 F.2d 143, 151 (5th Cir. 1983) (humiliation and mental distress); Swoager v. Credit Bureau, 608 F. Supp. 972, 977, n.7 (M.D. Fla. 1985).   The humiliation and distress of having potential creditors view false, derogatory information on one's credit report are cognizable damages under § 1681e(b).   Crane v. Trans Union, LLC, 2003 WL 22172346 at *5 (E.D. Pa.) (Goolsby Aff. ¶ 20, Ex. S) (denying summary judgment) (citing Millstone v. O'Hanlon Reports, Inc., 528 F.2d 829, 834-35 (8th Cir. 1976) Philbin, 101 F.3d at 963; Guimond v. Trans Union Credit Information Co., 45 F.3d 1329, 1333 (9th Cir. 1995); Stevenson v. TRW Inc., 987 F.2d 288, 296 (5th Cir. 1993)).

The foregoing case law shows that the sorts of damages Plaintiff suffered here are compensable under the FCRA.   Plaintiff has provided ample testimony of his emotional distress and the physical manifestations thereof.

### 2. A reasonable jury could conclude from the evidence that Defendants' violations were willful.

Under the FCRA, a consumer is entitled to statutory and punitive damages even absent actual damages when the violation is willful.   See 15 U.S.C. § 1681n(a)(1); Bakker, 152 F.3d at 1013; Yohay v. City of Alexandria Employees Cr. Union, 827 F.2d

967, 972 (4th Cir. 1987) (noting an award of punitive damages in the absence of any actual damages, in an appropriate case, comports with the underlying deterrent purpose of FCRA); see, e.g., Sather v. Weintraut, Civ. No. 01-1370 (JNE/JGL), slip op. at 7-8 (D. Minn. 2003) (Goolsby Aff. ¶ 18, Ex. Q) (denying the defendant's Motion for Summary Judgment under § 1681n while finding no actual damages); Schaffhausen v. Bank of America, Civ. No. 03-3492, slip op. at 12 (D. Minn. 2005)(Goolsby Aff. ¶ 19, Ex. R) (denying Bank of America's Motion for Summary Judgment with respect to Plaintiff's FCRA claim for punitive damages while granting the same defendant's Motion for Summary Judgment with respect to Plaintiff's FCRA claim for actual damages).  Neither malice nor evil motive need be shown to establish willfulness.  Thornton v. Equifax, 619 F.2d 700, 705 (8th Cir. 1980).  Conduct is willful if the defendant knew that such conduct violates the Act and intended to do it.  Phillips v. Grendahl, 312 F.3d 357, 368, 370 (8th Cir. 2002).  It has been held that a reasonable jury could conclude that a CRA's failure to transmit to a creditor the consumer's documentation provided with his dispute is a knowing or reckless violation of the Act. The Eight Circuit established in Phillips that "evidence that each defendant had some experience in dealing with credit reports and . . . knew of the Fair Credit Reporting Act . . . support[s] an inference that the defendants knew that their actions were impermissible." Id. at 371.

In this case, it was no accident that Trans Union and CSC concealed from DMCCB the nature of Plaintiff's dispute and the highly relevant information he had provided:  indeed, it was in accordance with their policies, and the CRA Defendants here insist that they did nothing wrong.  It was not, however, in accordance with the plain

language of the law, requiring CRAs to forward all relevant information. These Defendants thus – at best – turned a willful blind eye to the law. That means that without an effective deterrent on the CRAs, Bruce Beckstrom or other consumers who have been confused – by the CRAs themselves – with someone else could dispute a thousand times to no avail.

Trans Union's willfulness is further shown by the misrepresentations that the name matched when it did not and by Reger's remarkable claim, even in the context of this case and in the absence of a confirmed date of birth, that "the name the furnisher has in its system is irrelevant" (Reger Aff. ¶ 50.)

CSC's willfulness is further shown by its policy to not use the "FCRA relevant information" field on code 1 disputes, and its failure to delete the account from Plaintiff's file even upon being sued and even when DMCCB sent the UDF.

A reasonable jury could conclude that Trans Union and CSC did not want to invest reasonable time and expense into investigating and resolving the inaccuracy, and refused to use all the tools available to them. A reasonable jury could conclude that Trans Union and CSC were concerned only with doing things cheaply.

As noted, one CRA, Experian, made the reasonable investment in a procedure that worked. Although it was not a gargantuan task, Experian conducted a meaningful investigation, found the root of the problem, and fixed it. It would be unfair to Experian to let its competitors get away with the sorts of deliberate and facile procedures that – rather predictably – failed in this case.

Accordingly, a reasonable jury could reasonably conclude from the evidence that Defendants' violations were willful.

## CONCLUSION

In this case, it was not the furnisher DMCCB that initially improperly associated the account in question with the name Bruce Beckstrom.  The CRAs did that on their own.  While it may have been reasonable for the CRAs to assume initially that Bryce and Bruce were the same person, that is not the question in this case.  The question in this case is whether it was reasonable for the CRAs to continue to assume that Bryce and Bruce was the same person, when Bruce had explained they were not, and DMCCB's ACDV investigation responses were at best incomplete.

Dated this 14th day of July, 2005.          **CONSUMER JUSTICE CENTER, P.A.**

By:____s/John H. Goolsby_____
Thomas J. Lyons, Jr.
Attorney I.D. #:  0249646
John H. Goolsby
Attorney I.D. #:  0320201
342 East County Road D
Little Canada, Minnesota  55117
Telephone:  (651) 770-9707
Attorneys for Plaintiff